UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE LORETO, on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., a Virginia Corporation, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No.:  3:19-cv-01366-GPC-MSB<br><br>**ORDER DENYING MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT WITHOUT PREJUDICE**<br><br>**[ECF No. 43.]** |

Before the Court is Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.  ECF No. 43.  The Motion is unopposed.  On April 30, 2021, the Court held a hearing on this matter.  ECF No. 47.  For the reasons that follow, the Court DENIES Plaintiff's Motion without prejudice.

## I.    BACKGROUND

### A. Procedural History

On July 23, 2019, Plaintiff Jose Loreto ("Plaintiff") filed a putative class action and Fair Labor Standards Act ("FLSA") collective action complaint against Defendant

General Dynamics Information Technology, Inc. ("Defendant" or "GDIT") and Does 1 through 100.  ECF No. 1.  On September 5, 2019, Plaintiff filed his First Amended Complaint ("FAC"), which is the operative complaint in this case.  ECF No. 6 ("FAC"). In the FAC, Plaintiff alleges causes of action for: (1) failure to pay overtime wages under the FLSA, 29 U.S.C. §§ 201 et seq.; (2) failure to pay overtime wages under California Labor Code § 1194; (3) failure to timely pay wages at separation under California Labor Code §§ 201–203; (4) failure to provide accurate itemized wage statements under California Labor Code §§ 226(a) and (b); (5) failure to provide all premium wages under California Labor Code § 226.7; (6) violation of unfair business practices act, California Business and Professions Code §§ 17200–17208, along with Private Attorneys General Act ("PAGA") penalties for failure to pay overtime wages, timely pay wages at separation, provide accurate itemized wage statements, and provide all premium wages under California Labor Code §§ 2698 et seq.  *Id.*  Plaintiff alleges that as a non-exempt employee of GDIT in San Diego, he and other non-exempt employees receive lump sum payments not included the regular rate of pay, which results in the underpayment of overtime and premium wages, inaccurate wage statements, and failure to timely pay final wages to separated employees.  *Id.* ¶¶ 15–22, 56.  Plaintiff also alleges other defects in the wage statements that render them confusing or inaccurate.  *Id.* ¶¶ 23–26.

On October 15, 2019, Defendant filed an Answer to the FAC.  ECF No. 10.  On December 13, 2019, Magistrate Judge Michael S. Berg held an early neutral evaluation conference and the case did not settle.  ECF No. 17.  The parties subsequently agreed to participate in private mediation in the hopes of settling the case.  ECF No. 31 ¶ 6.  On August 17, 2020, after receiving leave of Court, Defendant filed an Amended Answer to the FAC.  ECF Nos. 35, 36.  On November 2, 2020, the parties filed a status report indicating that they had reached a settlement in principle through mediation.  ECF No. 37.  On March 10, 2021, Plaintiff filed the instant Motion for Preliminary Approval of Class Action Settlement.  ECF No. 43.

\ \ \

## B. Negotiation and Settlement Terms

Plaintiff and Defendant engaged in formal discovery prior to beginning mediation, and Defendants provided additional data, documents, and information relevant to class-wide liability and damages to allow the parties to prepare for mediation.  ECF No. 43-2 ("Geraci Decl.") ¶¶ 16–17; ECF No. 43-1 at 10.[1]  On October 2, 2020, the parties attended a nearly 14-hour mediation with Michael E. Dickstein, Esq., whom Plaintiff represents is an experienced and well-regarded wage and hour class action mediator. Geraci Decl. ¶ 18.  Following the mediation, the parties negotiated the detailed Settlement Agreement that is now submitted for preliminary approval.  *Id.*; ECF No. 45 ("Settlement Agreement")[2].

The Settlement Agreement provides for a non-reversionary Maximum Settlement Amount of $900,000, from which the following deductions would be made:

(a) attorneys' fees up to $300,000 to compensate class counsel;

(b) actual costs of $12,940;

(c) service payment to Plaintiff up to $10,000;

(d) settlement administration expenses up to $13,200;

(e) PAGA payment to the Labor Workforce and Development Agency ("LWDA") of $33,750 (75% of the $45,000 PAGA penalty);

(f) PAGA payment of $11,250 to PAGA members (June 26, 2018 through preliminary approval) (25% of the $45,000 PAGA penalty)

Geraci Decl. ¶ 20; Settlement Agreement ¶ 56(a)–(f).  After these deductions, the remaining sum, or Net Settlement Amount, would be distributed to all class members who do not opt-out of the settlement ("Settlement Class Members").  Geraci Decl. ¶ 22; Settlement Agreement ¶ 56(f)–(h).  Plaintiff's counsel estimates the Net Settlement

---

[1] Page numbers refer to the CM/ECF pagination.

[2] After filing the instant motion, Plaintiff filed the fully-executed Settlement Agreement to replace the partially-executed settlement agreement that was attached as Exhibit 1 to the Declaration of Jeff Geraci filed in conjunction with Plaintiff's motion.  ECF No. 45 at 2.  No substantive changes were made.  *Id.*

Amount to be $518,860.  Geraci Decl. ¶ 22.  The Settlement Agreement provides that the Net Settlement Amount will be divided as follows:

> (a) Former employees (estimated to be 305) will receive $200 as a "Waiting Time Penalties Payment," and the remaining approximately $457,860 will make up the "Workweek Fund."

> (b) Settlement Class Members will be credited three points for each week of the Class Period in which more than 8 hours in a day or 40 hours in a week was worked ("Overtime Workweeks") and one point for each week in the Class Period in which overtime was not worked ("Non-Overtime Workweeks").  Each Settlement Class Member's share of the Workweek Fund will be determined by dividing each member's points by the total number of points assigned to all Settlement Class Members.

Geraci Decl. ¶¶ 23–24; Settlement Agreement ¶ 56(g)–(h).  Plaintiff calculates the per-workweek value of the settlement to be $4.22 for Non-Overtime Workweeks and $12.66 for Overtime Workweeks, with a blended value of $7.43 per workweek.  Geraci Decl. ¶ 25.  The settlement payments would be allocated 50% to wages and 50% to interest and penalties.  *Id.* ¶ 26.

The Settlement Agreement provides that following final approval and the effective date of settlement, each Settlement Class Member who did not request exclusion will be mailed their share of the Net Settlement Amount without need to submit a claim form. *Id.* ¶ 27; Settlement Agreement ¶¶ 78, 86.  PAGA members would be mailed the PAGA payment even if they opt-out of the class settlement.  Geraci Decl. ¶ 27; Settlement Agreement ¶ 58.  After 120 days,[3] uncashed settlement payments would be sent to the State Controller Unclaimed Property Division.  Settlement Agreement ¶ 87.

---

[3] The Geraci Declaration states that the deadline is 150 days, but this appears to conflict with the Settlement Agreement, which indicates that class members will be unable to cash their checks after the 120 day period and the settlement administrator has up to 30 days to notify Class Counsel that uncashed

Members of the class can be identified by Defendant's employment records. Geraci Decl. ¶ 31.  To provide notice to the class, the claims administrator would conduct a search of the National Change of Address database to update class members addresses, and mail a Notice of Class Action Settlement ("Class Notice"), Change of Address form, and pre-printed return envelope ("Notice Packet") to each member of the class as identified in the employment records.  *Id.*; Settlement Agreement ¶¶ 71–73.  The proposed Notice informs the class members of their right to, and the manner and timing in which to: "(1) participate in the Settlement without submitting a claim; (2) dispute the basis of the Individual Settlement Payment; (3) object to the Settlement; and, (4) opt-out of the Settlement."  Geraci Decl. ¶ 32.  The Notice will also estimate the amount of the class member's individual payment and inform them of the release, the date of the Final Approval hearing, and how to obtain further information by contacting class counsel, access the website set up by the claims administrator, and access the court's docket.  *Id.* The proposed Notice is included as Exhibit A to the Settlement Agreement.  Settlement Agreement at 42–45 (Ex. A).

The Settlement Agreement releases:

[A]ny and all claims, obligations, demands, actions, rights, causes of action, and liabilities against GDIT Releasees, whether in law or equity, that have been asserted in the Complaint, or could have been asserted in the Complaint based on the facts and allegations pled therein, and including all such claims for recovery or compensation, and/or all penalties under the California Labor Code and California's Wage Orders, the California Business & Professions Code, from July 23, 2015 through the Preliminary Approval Date.

*Id.* ¶ 34.  With respect to the released claims, Settlement Class Members also waive rights under California Civil Code § 1542.  *Id.*  PAGA Group members also are subject to an equivalent release of claims under PAGA throughout the PAGA period.  *Id.* ¶ 35.

---

amounts have been sent to the Controller of the State of California. Geraci Decl. ¶ 27; Settlement Agreement ¶ 87.

The Settlement Agreement does not cover or release the FLSA claims. The agreement provides that the parties will jointly file a motion for leave for Plaintiff to file a Second Amended Complaint to permit Plaintiff to dismiss the FLSA claims without prejudice. Geraci Decl. ¶ 13; Settlement Agreement ¶ 45. Plaintiff determined the FLSA claims should not be pursued because "The FLSA claim applied to hours over 40 per week; GDIT's compliance with DOL guidance was a strong good faith defense, which limited the FLSA period to two years and precluded liquidated damages; No contact was made with any non-California employee; No notice was given; No one attempted to opt-in; and, no release is being given for FLSA claims." Geraci Decl. ¶ 19.

## II.    DISCUSSION

### A. Legal Standard

The Ninth Circuit has a strong judicial policy that favors settlements in class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). However, when the parties settle before class certification, the court must "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). To that end, a reviewing court must engage in two, separate inquiries: (1) whether the proposed class meets the certification requirements and (2) whether the proposed settlement is "fundamentally fair, adequate, and reasonable." *Id.* At the preliminary approval stage, the reviewing court considers whether it is likely to approve of the proposal and certify the class. Fed. R. Civ. P. 23(e)(1)(B).

### B. Provisional Class Certification under Rule 23

Federal Rule of Civil Procedure ("Rule") 23 establishes four prerequisites for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Under Rule 23(b)(3), common questions must predominate over individual questions, Fed. R. Civ. P. 23(b)(3), and the class action device must be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* The Court does not finally certify a class when granting

preliminary approval of a settlement for the purpose of directing notice to class members, but rather determines whether "the court will *likely* be able to . . . certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B) (emphasis added).

Plaintiff seeks conditional certification of a Class defined as "all GDIT non-exempt employees in California at any time between July 23, 2015 and September 30, 2020." ECF No. 43-1 at 8. Plaintiff argues that the requirements of Rule 23(a) are met such that the Class can be certified for the purposes of settlement. *Id.* at 23–25.

The numerosity requirement under Rule 23(a)(1) is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when membership dips below 21." *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Plaintiff estimates that there are 747 Class Members.[4] ECF No. 43-1 at 8, 24. Joinder of this number of plaintiffs is clearly impractical, and courts have certified classes with far fewer members. *See Immigrant Assistance Project of Los Angeles Cty. Fed'n of Lab. (AFL-CIO) v. I.N.S.*, 306 F.3d 842, 869 (9th Cir. 2002) (citing *Jordan v. Cty. of Los Angeles*, 669 F.2d 1311, 1319, n.10 (9th Cir. 1982)). The numerosity requirement is therefore satisfied.

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is established if plaintiffs and class members' claims "depend upon a common contention . . . capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores,*

---

[4] Elsewhere, counsel references that the Proposed Settlement would extend to 724 employees. Geraci Decl. ¶ 9. The Court notes that the Proposed Settlement provides that "[i]f the number of Class Members as of September 30, 2020 exceeds 724 individuals by more than 5% (more than 761 individuals), GDIT will increase the Maximum Settlement Amount on a pro rata basis per person to cover the number of Class Members above 761." Settlement Agreement, ¶ 56(i). While it is not clear whether the 747 estimate comes from a different source or is merely a typographical error, any estimate in the range of 700 employees easily satisfies the numerosity requirement.

*Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Here, Plaintiff's complaint alleges questions common to the entire class for all claims, including the legality of Defendant's method of calculating the regular rate of pay and the sufficiency of its wage statements.  Although the claim related to timely payment of wages at separation is relevant to only a subset of putative class members who are no longer employed by GDIT, that claim still depends on whether Defendant properly calculated the regular rate of pay.  *Cf. Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) ("[A] class meets Rule 23(a)(2)'s commonality requirement when the common questions it has raised are apt to drive the resolution of the litigation, no matter their number.") (internal quotation marks and citation omitted).  The Court therefore finds that the proposed class meets the commonality requirement.

Rule 23(a)(3)'s typicality requirement will be satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The named plaintiff must be a member of the class they seek to represent and must "possess the same interest and suffer the same injury" as putative class members.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotations omitted).   The representative claims are typical if they are "reasonably co-extensive with those of absent class members," though they "need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).  Plaintiff's claims are typical of the putative class because he was a non-exempt employee of GDIT who was subject to the same regular rate policies and issued the wage statements with the same alleged deficiencies as other class members.  FAC ¶ 15–21.

Under Rule 23(a)(4), representative parties must be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  In analyzing whether Rule 23(a)(4) has been met, the Court must ask two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

class?"  *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (citation omitted).  The adequacy of representation requirement is designed to deny certification in instances of "actual fraud, overreaching, or collusion."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (emphasis in original).

It does not appear that Plaintiff has any interests that are in conflict with the class other than the potential Service Payment, and his active participation in the lawsuit, including in discovery and mediation, has allowed it to progress to a settlement that Plaintiff contends will benefit the entire class.  *See* ECF No. 43-4 ("Loreto Decl.").  As discussed in more detail below, the maximum $10,000 allocated to a Service Payment to Plaintiff in the Settlement Agreement is not so disproportionate that it would likely render Plaintiff an inadequate representative, considering he will be required to justify the basis for the award and the Court will carefully scrutinize the request.  *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).  Plaintiff's counsel, attorneys from the law firms Cohelan Khoury & Singer and Ferraro Vega Employment Lawyers, are experienced labor and employment litigators who have litigated numerous class actions in this district and other courts.  Geraci Decl. ¶¶ 3–8, 40; ECF No. 43-3 ("Ferraro Decl.") ¶¶ 13–25.  There is no indication that Plaintiff or his counsel will not continue to prosecute this lawsuit vigorously.  The Court therefore concludes the adequacy requirement is met for the purposes of conditional certification.

Finally, to certify a class under Rule 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Predominance tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  For settlement purposes, a class settlement is superior to other available methods for a fair resolution of the controversy because the class mechanism will reduce litigation costs and

promote greater efficiency.  In a class action settlement, the Court need not address whether the case, if tried, would present issues of manageability under Rule 23(b)(3)(D). *Amchem*, 521 U.S. at 620.

Here, liability hinges on whether Defendant's method of calculating the regular rate of pay was unlawful and whether the information provided on wage statements was inaccurate.  Because liability would be determined by looking at GDIT's uniform policies and practices and concentrating litigation of the issue in one lawsuit would be the most efficient, the Court concludes that common questions predominate and a class action is the superior vehicle towards adjudicating the dispute.  Accordingly, the Court will conditionally certify the class for settlement purposes only.

Under Rule 23(g), "a court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1). The Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).

Plaintiff argues that his counsel should be provisionally designated as class counsel but does not specifically point to the factors enumerated in Rule 23(g).  ECF No. 43-1 at 25.  However, the Court independently finds that provisional designation of counsel from Cohelan Khoury & Singer and Ferraro Vega Employment Lawyers is appropriate.  Plaintiff's counsel has engaged in significant informal and formal discovery to investigate the claims of the proposed class.  Geraci Decl. ¶¶ 16–17.  As noted above, counsel has extensive experience litigating class actions in the labor and employment field and have been recognized in the legal community for their expertise. *Id.* ¶¶ 4–8; Ferraro Decl. ¶¶ 13–15, 24–25.  As counsel has already invested significantly in the development, litigation, and settlement of this case, the Court anticipates that counsel will continue to devote appropriate resources to represent the class.  The Court therefore finds that Plaintiff's attorneys should be provisionally designated as class counsel.

Additionally, the Court finds provisionally appointing Plaintiff Loreto as class representative is appropriate. His interests align with those of the proposed class members, and no conflicts of interest have been revealed that would render him an inappropriate class representative. *See* Loreto Decl. The Court therefore determines that Plaintiff should be appointed class representative for the provisionally certified class.

## C. Preliminary Approval of Class Action Settlement

Before approving a proposed class action settlement, a court must find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). At the preliminary approval stage, the question is whether approval under the "fair, reasonable, and adequate" standard is likely. Fed. R. Civ. P. 23(e)(1)(B). Any fairness determination requires the Court to "focus[ ] primarily upon whether the particular aspects of the decree that directly lend themselves to pursuit of self-interest by class counsel and certain members of the class—namely attorney's fees and the distribution of any relief, particularly monetary relief, among class members—strictly comport with substantive and procedural standards designed to protect the interests of class members." *Staton*, 327 F.3d at 960. Courts evaluate the "settlement as a whole, rather than assessing its individual components." *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012).

Rule 23(e) was amended in 2018 to create uniformity amongst the circuits and to focus the inquiry on whether a proposed class action is "fair reasonable, and adequate." Fed. R. Civ. P. 23(e), advisory committee notes (2018 amendment). As amended, Rule 23(e) provides that a court may approve a proposed class action settlement after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The first and second factors are viewed as "procedural" in nature, and the third and fourth factors are viewed as "substantive" in nature. Fed. R. Civ. P. 23(e)(2), advisory committee notes (2018 amendment).

### 1. Adequacy of Representation

Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). This analysis is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." 4 William B. Rubenstein, Newberg on Class Actions § 13:48 (5th ed. 2020); *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 701 (S.D.N.Y. 2019) (noting similarity of inquiry under Rule 23(a)(4) and Rule 23(e)(2)(A)).

The Court found above that Plaintiff and his counsel adequately represent the class for the purposes of conditional class certification. For the same reasons, the Court finds that the adequacy of representation requirement under Rule 23(e)(2)(A) is likely met.

### 2. Arm's Length Negotiation

Rule 23(e)(2)(B) requires the Court to consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Here, the settlement is the result of an arm's length negotiation facilitated by an experienced mediator after the exchange of sufficient discovery to allow the parties to ascertain Defendant's potential exposure based on employee pay data. Geraci Decl. ¶¶ 16–18, 37–39; *see Chambers v. Whirlpool Corp.*, 980 F.3d 645, 669 (9th Cir. 2020) ("The district court . . . correctly determined there was no collusion because," among other things, "the parties settled via arm's length negotiations before an experienced mediator."); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair."). The Court therefore concludes that this factor is likely satisfied.

3.  <u>Adequacy of Relief Provided to the Class</u>

Rule 23(e)(2)(C) requires that the Court consider whether "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C). The amount offered in the proposed settlement agreement is generally considered to be the most important consideration of any class settlement. See *Bayat v. Bank of the West*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015) (citing *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178–79 (9th Cir. 2013)).

The parties agreed to settle the case for a non-reversionary Maximum Settlement Amount of $900,000. After deductions for attorney's fees, litigation costs, a service payment to Plaintiff, settlement administration expenses, and PAGA penalties (discussed below), Plaintiff estimates that $518,860 will be distributed to Settlement Class Members. Geraci Decl. ¶ 20, 22; Settlement Agreement ¶ 56(a)–(f). An estimated $61,000, or $200 each, will be distributed to former employees as a "Waiting Time Penalties Payment" to account for Plaintiff's claim that Defendant failed to timely pay wages due at separation. Settlement Agreement ¶¶ 42, 56(g). The remaining "Workweek Fund" is estimated to be $457,860 and would be distributed to Settlement Class Members based on the Overtime Workweeks and Non-Overtime Workweeks worked. Geraci Decl. ¶ 24. A Settlement Class Member who worked the entire class period is estimated to receive between $1,141.93 and $3,425.80, depending on the number of Overtime Workweeks worked. *Id.* ¶ 25.

        i.     Costs, risks, and delay of trial and appeal

"To evaluate adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). Here, the Maximum Settlement Amount is

$900,000, while Plaintiff estimates Defendant's maximum potential liability to be about $3.55 million.  Geraci Decl. ¶ 53.  However, Plaintiff calculates that Defendant's realistic exposure is much less than that, given that Defendant has a potentially meritorious defense that, if accepted, would likely thwart Plaintiff's possibility of success on all claims, as well as several claim-specific defenses that undermine the strength of Plaintiff's case.  Based on those potential risks, Plaintiff contends that the settlement amount provides adequate relief to the class.  While a settlement need not compensate class members for the maximum value of their claims, there is no fixed percentage of the potential recovery that renders a settlement amount reasonable.  *See In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 65 (D.D.C. 2003) (citing *In re Newbridge Networks Sec. Litig.*, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998)).  The Court therefore must examine whether the Settlement Agreement will likely adequately compensate the class given the costs, risks, and delay of trial and appeal based on the facts of this case.

The crux of Plaintiff's complaint is that the class was underpaid for overtime wages due to GDIT's failure to include pay in lieu of benefits paid for work in the regular rate of pay.  FAC ¶ 20.  However, Defendant argues that the Service Contract Act ("SCA"), 41 U.S.C. §§ 6701 *et seq.* provides a defense to Plaintiff's claims.[5]  ECF No. 36 at 28.  The SCA provides that "[i]n determining any overtime pay to which a service employee is entitled under Federal law, the regular or basic hourly rate of pay of the service employee does not include any fringe benefit payments computed under this chapter which are excluded from the definition of 'regular rate' under" the FLSA.  41 U.S.C. § 6707(e).  While Plaintiff maintains that this provision prevents Defendant from excluding the pay in lieu of benefits at issue from the regular rate of pay, Defendant has

---

[5] At the hearing, the Court questioned counsel as to what proportion of the class worked pursuant to the SCA, in the event that some members of the class would not be subject to this defense.  Counsel represented that those who did not work pursuant to the SCA would primarily only have a claim for wage statement penalties, so the issue is not relevant.  The Court is satisfied by counsel's explanation that this likely does not affect the fairness of the proposed settlement, but requests that counsel include a fuller explanation of this issue in its subsequent motion so that it may be reflected in the record.

argued that the pay in lieu of benefits it provides may be excluded from the regular rate of pay under the SCA, as interpreted by the Department of Labor ("DOL").[6]  Geraci Decl. ¶ 43.  Plaintiff maintains that the DOL's interpretation is not entitled to deference because the relevant provision of the SCA is unambiguous.  ECF No. 43-1 at 18.  While two district court opinions have adopted this view, *see Barnes v. Akal Sec., Inc.*, No. 04-1350-WEB, 2005 WL 1459112, at *5 (D. Kan. June 20, 2005); *Bonner v. Metro. Sec. Servs., Inc.*, No. SA-10-CV-937-XR, 2011 WL 902252, at *3 (W.D. Tex. Mar. 15, 2011), at least one district court has taken the opposing position and deferred to the DOL regulation, *see Phelps v. Parsons Tech. Support, Inc.*, No. CIV. 2:09-0327-JMS, 2010 WL 4386920, at *2 (S.D. Ind. Oct. 29, 2010)  Based on the Court's review, there appears to be no Ninth Circuit authority on this issue.  Because Defendant has a potentially meritorious defense to all liability, proceeding to trial would entail some risk that Plaintiff would recover nothing.  The existence of this risk supports a finding that the Maximum Settlement Amount, which is equivalent to about 25% of the class's total potential recovery on the class claims, would adequately compensate the class.

Aside from Defendant's primary defense, Plaintiff recognizes that his claims have other possible weaknesses that increase the risks attendant to litigation.[7]

First, with respect to Plaintiff's overtime wage claim under California Labor Code § 1194, Plaintiff notes that Defendant argues that the alleged overtime premiums would be calculated at a 0.5 rate, rather than a 1.5 rate.  ECF No. 43-1 at 19.  While the Court

---

[6] The DOL regulation provides:

> If the employer furnishes equivalent benefits or makes cash payments, or both, to an employee as therein authorized, the amounts thereof, to the extent that they operate to discharge the employer's obligation under the [SCA] to furnish such specified fringe benefits, may be excluded pursuant to such Act from the employee's regular or basic rate of pay in computing any overtime pay due the employee under the Fair Labor Standards Act.

29 C.F.R. § 778.7.

[7] The Court separately considers the adequacy of the Settlement with respect to the PAGA penalties *infra*.

does not evaluate the merits of either party's position, this dispute could also potentially decrease the class recovery were Plaintiff to proceed to trial.

Second, as to the premium wages claim under California Labor Code § 226.7, Plaintiff notes that Defendant disputed the legal validity of this claim, citing case law holding that rest or meal break premiums are not paid at the regular rate but rather the base hourly wage. Geraci Decl. ¶ 47 (citing *Ferra v. Loews Hollywood Hotel, LLC*, 40 Cal. App. 5th 1239, 1246 (2019)). Plaintiff states that "[b]ased on information exchanged in formal and informal discovery, the legal disputes about the merits of the claim, and GDIT's defenses, Plaintiff did not assign value to this claim." ECF No. 43-1 at 19. Based on an initial review of the law, the Court does not disagree that the class would be unlikely to succeed on this claim. It is thus not unreasonable for Plaintiff to exclude this claim from the overall valuation of potential class recovery.

Third, as to the waiting time penalties under California Labor Code § 203, Plaintiff notes that he may have difficulty establishing liability for this claim because the penalty is only available if the failure to pay all wages due at separation is "willful." Cal. Lab. Code § 203(a). This would likely require Plaintiff to prove that Defendant's reliance on the DOL regulation, which approves of its method of calculating the regular rate of pay, was not in good faith. *See Diaz v. Grill Concepts Servs., Inc.*, 23 Cal. App. 5th 859, 868 (2018) (employer's failure to pay not willful if due to uncertainty in the law or good faith dispute). Defendant's potential good faith defense thus increases the risk that the class would not recover on this claim if the case proceeded to trial.

Fourth, as to the wage statement penalties under California Labor Code § 226, Plaintiff explains that his argument that the wage statements were not compliant is weaker with respect to wage statements issued after December 2019, at which point GDIT began including hours and rates for overtime. Geraci Decl. ¶ 50. Thus, even if Plaintiff were to prevail on the regular rate issue, the class faces an uncertain chance of recovery for the pay periods between December 2019 and the time of settlement.

Accordingly, although the settlement amount is only a portion of Defendant's maximum potential exposure according to Plaintiff's calculations, the relief appropriately accounts for the not insubstantial risk that Plaintiff and the class would recover nothing on some or all claims. *Cf. Mejia v. Walgreen Co.*, No. 2:19-CV-00218 WBS AC, 2021 WL 1122390, at *4–5 (E.D. Cal. Mar. 24, 2021) (finding that existence of potential defenses weighs in favor of finding reasonable the proposed settlement amount of approximately 22.37% of maximum possible recovery). Additionally, proceeding to trial and through any resulting appeal would bring further costs and delay. The Court therefore concludes that the costs and risks of proceeding with litigation likely renders the agreed-upon settlement amount, at 25% of Defendant's maximum potential liability,[8] adequate relief for the class as a whole. *See Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198, 2016 WL 5907869, at *3, 7 (N.D. Cal. Oct. 11, 2016) (approving a California wage and hour settlement where the class received 11.6% of the estimated total liability, or approximately $29 per work week); *Leverage v. Traeger Pellet Grills, LLC*, No. 16-CV-00784, 2017 WL 2797811, at *7 (N.D. Cal. June 28, 2017) (approving a California wage and hour settlement where the class received 18% of the estimated total liability).

ii.     Effectiveness of proposed method of distributing relief

Pursuant to the Settlement Agreement, class members will not have to submit claims to receive payment. Instead, class members will be identified through Defendant's employment records, the claims administrator will search for class members' most recent address and give them an opportunity to update their address when the Class Notice is sent, and class members will receive the settlement payment by mail unless they opt-out of the settlement. Settlement Agreement ¶¶ 71, 72, 78, 86, Ex. A. Each class member's share will be calculated based on whether they are a former employee and thus eligible for the "Waiting Time Penalties Payment," and how many overtime and non-

---

[8] The estimated Net Settlement Amount is about 15% of Defendant's maximum potential liability.

overtime workweeks they worked, all of which can be readily determined by Defendant's employment records, and class members will have an opportunity to challenge errors relating to their dates of employment. *Id.* ¶¶ 42, 57(g)–(h), 80. Thus, the method of distributing relief is simple and effective. *See Walters v. Target Corp.*, No. 3:16-CV-1678-L-MDD, 2019 WL 6696192, at *6–7 (S.D. Cal. Dec. 6, 2019); *Valenzuela v. Walt Disney Parks & Resorts U.S., Inc.*, No. SACV171988JVSDFMX, 2019 WL 8647819, at *8 (C.D. Cal. Nov. 4, 2019).

            iii.    Terms of proposed award of attorney's fees

The Settlement Agreement provides that Defendant will not oppose Class Counsel's motion for attorney's fees, provided it does not exceed $300,000. Geraci Decl. ¶ 56; Settlement Agreement ¶ 56(a). "While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. Courts are wary of "clear sailing agreements," in which the defendant agrees not to oppose a fee motion as long as it does not exceed a set amount, because of the concern that counsel may have "bargained away something of value to the class" in exchange. *See id.* at 947–48 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)).

Fees can be calculated by either the lodestar or percentage-of-recovery method in class actions that result in benefits to the entire class. *Id.* at 942. While the maximum amount to be sought by Class Counsel is one-third of the fund, higher than the benchmark 25% courts look to when employing the percentage-of-recovery method, Counsel attests that the lodestar, as of the date of Plaintiff's motion, amounts to $297,623. Geraci Decl. ¶ 57; *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). The Court need not determine at the preliminary approval stage whether it will ultimately approve an award in the range of $300,000. It is sufficient for the Court to conclude that this is not a situation in which the attorney's fee provision of the Settlement

Agreement is so out of proportion with the relief provided to the class that it "calls into question the fairness of the proposed settlement." *Pokorny v. Quixtar Inc.*, No. 07-0201 SC, 2011 WL 2912864, at *1 (N.D. Cal. July 20, 2011).  In any event, the Settlement Agreement is not conditioned on any particular award of attorney's fees, and provides that none of the $900,000 Maximum Settlement Amount will revert to Defendant. Settlement Agreement ¶ 56(j).  Any difference between the up to $300,000 requested by Plaintiff's counsel and the amount of fees the Court ultimately determines is reasonable will not revert to Defendant, and will be added to the Net Settlement Amount.  *Id.*; *cf. Bluetooth*, 654 F.3d at 949 (noting the unfairness of "kicker" provisions that allow reversion to defendant in the case of a lesser attorney's fee award).  This lessens the potential unfairness of the clear sailing provision.

However, if Plaintiff appeals the Court's order on attorney's fees, costs, or the Class Representative Service Payment, the Settlement Agreement provides that "any amount not approved by the Court will not be added to the Net Settlement Amount and after the resolution of the appeal any amount not approved, if any, will be distributed by *cy pres* to the California CASA Association."  Settlement Agreement ¶ 56(j). Distribution to a *cy pres* recipient may be appropriate when payment of unclaimed funds to individual class members is impractical.  *See In re Easysaver Rewards Litig.*, 906 F.3d 747, 760 (9th Cir. 2018).  The Court recognizes that *cy pres* distribution may be warranted in the situation contemplated by the Settlement Agreement, given that the potential amount to be distributed post-appeal could be quite small compared to the administrative expenses involved in making a second distribution likely several years after the first distribution.  However, "[c]y pres distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members."  *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).  The Court cannot approve "*cy pres* distributions to myriad charities which, though no doubt pursuing virtuous goals, have little or nothing to do with the purposes of the underlying lawsuit or the class of plaintiffs involved."  *Id.* at 1038–39.

Here, the California CASA Association is an organization that advocates for children or youth in the foster care system. *See What We Do: California CASA*, California Court Appointed Special Advocates Association, https://www.californiacasa.org/state-priorities. This provision of the Settlement Agreement is not addressed in Plaintiff's motion, and the Court cannot discern a connection between this charity's purpose and the California labor laws at issue or the class of employees, although counsel represented at the hearing that the organization has been approved in other cases. *Cf. Urena v. Cent. California Almond Growers Assn.*, No. 1:18-CV-00517-NONE-EPG, 2020 WL 3483280, at *13 (E.D. Cal. June 26, 2020) (noting that CASA did not appear to have a relationship to California labor law or class members), *report and recommendation adopted*, No. 1:18-CV-00517-NONE-EPG, 2020 WL 4593824 (E.D. Cal. Aug. 11, 2020). This part of the Settlement Agreement will only be invoked if (1) the Court refuses to grant in full Plaintiff's request for attorney's fees, expenses, or the service payment, (2) Plaintiff elects to appeal, and (3) Plaintiff does not succeed on his appeal. But while a challenge to the *cy pres* recipient may not be ripe at this stage, *see Urena*, 2020 WL 3483280, at *13 (citing *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009)), the Ninth Circuit has made clear that district courts should not approve settlements that provide for distributions to improper cy pres recipients. *Nachshin*, 663 F.3d at 1038–40; *see also Eddings v. Health Net, Inc.*, No. CV 10-1744-JST RZX, 2013 WL 169895, at *4 (C.D. Cal. Jan. 16, 2013) (considering propriety of *cy pres* recipient at preliminary approval stage). Accordingly, the Court determines it is not likely to approve this portion of the settlement regarding the potential *cy pres* distribution of settlement funds based on the information before it.

Thus, while the Court concludes that the proposed award of attorney's fees does not itself call into question the adequacy of the relief provided to the class, the Court finds that the *cy pres* distribution set out in the Settlement Agreement likely cannot be approved. In a subsequent motion for preliminary approval of settlement, the Court

instructs the parties to identify why any new *cy pres* organization they select is appropriate under the standard set out by the Ninth Circuit.

### iv.    Agreements made in connection with the proposal

Rule 23(e)(3) requires that the Parties "must file a statement identifying any agreement made in connection with the [settlement] proposal."  Fed. R. Civ. P. 23(e)(3). Plaintiff has not identified any such agreement and the Court is not aware of any other agreements.

### 4.  Equitable Treatment of Class Members

Rule 23(e)(2)(D) requires the Court to consider whether the Settlement Agreement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). In doing so, the Court determines whether the settlement "improperly grant[s] preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23(e)(2)(D), advisory committee notes (2018 amendment); *see also* 4 William B. Rubenstein, Newberg on Class Actions § 13:56 (5th ed. 2020) ("Put simply, the court's goal is to ensure that similarly situated class members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated.").

### i.    Equity between class members with different claims

Plaintiff asserts that "[t]he method of distribution allocates funds based on weeks worked, and the basis of the claims, and does not give preference to any Class Member." ECF No. 43-1 at 12.  The Court generally agrees that the distribution method of the "Workweek Fund," which essentially compensates class members for unpaid overtime

and wage statement penalties,[9] is likely equitable if not exactly precise.  Class members will receive a greater payment for the weeks in which they worked overtime, which appropriately reflects the fact that the lawsuit's primary claims arise from the underpayment of overtime and the effect that had on the accuracy of the wage statements.

However, with respect to the additional "Waiting Time Penalties Payment" to be made to former employees, the Court has some concerns, which it highlighted to counsel at the hearing.  Plaintiff has calculated that the maximum exposure for the waiting time penalty claim under California Labor Code § 203 to be about $1.9 million, or about $6,240 per former employee assuming each employee was owed maximum damages. ECF No. 43-1 at 19.  Plaintiff determined that due to the difficulty of establishing that any violation was willful, there is no more than a 25% probability of prevailing, and thus estimated realistic exposure on the waiting time penalty claim to be $475,800, or about $1,560 per former employee.  *Id.* at 19–20.  Under the Settlement Agreement, these former employees will receive only $200 each as a "Waiting Time Penalties Payment," or about 12.8% of Defendant's realistic exposure.  Settlement Agreement ¶¶ 42, 56(g).  In contrast, the Settlement Agreement appears to pay more than 100% of what Plaintiff estimated was the realistic exposure for the overtime and wage statement claims.[10]  Thus, the allocation of the settlement proceeds appears skewed against the waiting time penalty claims and thus against former employees, compared to what class members would be expected to recover at trial.

---

[9] The Court gathers this from the fact that, excluding PAGA penalties, these and waiting time penalties were the only claims included in the calculations of realistic potential damages.  *See* ECF No. 43-1 at 19–20, 22 ($146,205 for overtime + $475,800 for waiting time penalties + $271,330 for wage statement penalties = $893,335, the realistic potential value of class claims).  Thus, it would appear that the "Waiting Time Penalties Fund" seeks to compensate class members for waiting time penalties under California Labor Code § 203 and the "Workweek Fund" seeks to compensate class members for overtime wages under California Labor Code § 1194 and wage statement penalties under California Labor Code § 226.

[10] Plaintiff calculated the realistic exposure for the overtime and wage statement penalty claims to be $146,205 and $271,330, respectively, for a total of $417,535.  Geraci Decl. ¶¶ 45, 50.  Plaintiff estimates that the "Workweek Fund" will be approximately $457,860.

1    While this discrepancy causes the Court some concern, it does not necessarily

2    mean that the Settlement Agreement would be found not fair, reasonable, and adequate

3    on this basis alone.  At the hearing, Plaintiff's counsel suggested that there were other

4    considerations that led the parties to reduce the amount allocated to the waiting time

5    penalties payment in favor of the Workweek Fund, from which former employees will

6    also receive a settlement.  Plaintiff may therefore be able to justify its decision to

7    significantly discount the waiting time penalty.  Thus, the Court will require Plaintiff on a

8    renewed motion to fully explain why the proposed distribution between the waiting time

9    penalties and the other claims is equitable.

10                   ii.    Equity between unnamed members and class representative

11    The Court also considers whether the proposed $10,000 "Service Payment" to

12    Plaintiff raises concerns about the equity of the proposed settlement.  Additional

13    payments to class representatives or named plaintiffs, often referred to as incentive

14    awards, generally do not render a settlement inequitable because such payments reflect

15    that these plaintiffs have contributed efforts to benefit the class while bearing the risk of

16    nonrecovery and retaliation.  *See Staton*, 327 F.3d at 977.  However, courts have refused

17    to countenance settlements that provide for excessively high incentive awards or that give

18    only *de minimis* relief to the rest of the class.  *See id.* at 948, 978 (finding settlement

19    inequitable where class representatives and other "active participants" were to receive up

20    to $50,000 in incentive awards each and collectively receive more than half of the total

21    monetary award despite representing less than 2% of the class).  Here, the $10,000 that

22    Class Counsel will request for Plaintiff Loreto to compensate him for his participation in

23    this lawsuit over the course of nearly two years is not unheard of.  Loreto Decl. ¶¶ 16–20;

24    *See Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335–36 (N.D. Cal. 2014) (noting

25    that while "presumptively reasonable" award is $5,000, courts have granted higher

26    awards when warranted by the facts of the case).  Further, a $10,000 payment is

27    equivalent to about 1% of the Maximum Settlement Amount and 2% of the Net

28    Settlement Amount.  While the Court need not decide now whether a $10,000 incentive

23

1    award is justified,[11] the fact that such a payment is contemplated by the Settlement

2    Agreement does not render the settlement inequitable.

3        The Court thus determines that the Settlement Agreement may provide equitable

4    treatment of class members, but requests further information as to the distinction between

5    the waiting time penalties claims and other claims.  The Court will direct Plaintiff to

6    provide further support for this factor in any renewed motion.

7        5.  <u>PAGA Claims</u>

8        Because Plaintiff's complaint includes claims under PAGA and the Settlement

9    Agreement provides for PAGA penalties, the Court must take into account special

10   considerations of that statute to determine whether provisional approval of the settlement

11   is appropriate with respect to those claims.

12       Under PAGA, an "aggrieved employee" may bring an action for civil penalties for

13   labor code violations on behalf of himself and other current or former employees.  Cal.

14   Lab. Code § 2699(a).  A plaintiff suing under PAGA "does so as the proxy or agent of the

15   state's labor law enforcement agencies."  *Arias v. Superior Ct.*, 46 Cal. 4th 969, 986

16   (2009).  A PAGA plaintiff thus has "the same legal right and interest as state labor law

17   enforcement agencies" and the action "functions as a substitute for an action brought by

18   the government itself"; therefore, "a judgment in that action binds all those, including

19   nonparty aggrieved employees, who would be bound by a judgment in an action brought

20   by the government."  *Id.*  A plaintiff bringing a representative PAGA action not only

21   owes a duty to their "fellow aggrieved workers," but "also owes responsibility to the

22   public at large; they act, as the statute's name suggests, as a private attorney general."

23   *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133–34 (N.D. Cal. 2016).  Under

24   PAGA, civil penalties collected are distributed between the aggrieved employees (25%)

25

26

27   _____

[11] Indeed, the Court "must be vigilant in scrutinizing all incentive awards," and the Court advises
28   Plaintiff that it will carefully examine the basis for the request before approving of any service payment
     in this case.  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

and LWDA (75%).  Cal. Lab. Code § 2699(i).  Any settlement of PAGA claims must be approved by the Court.  Cal. Lab. Code § 2699(l)(2).  The proposed settlement must also be sent to the agency at the same time that it is submitted to the court.  Cal. Lab. Code § 2699(l)(2).

The California Supreme has held that PAGA actions are fundamentally different from class actions and a plaintiff need not satisfy the class action requirements.  *Arias*, 46 Cal. 4th at 982-84.  The Ninth Circuit has also held that a PAGA suit is fundamentally different from a class action under CAFA.  *Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1123 (9th Cir. 2014) (district court had no subject matter jurisdiction over removed PAGA action under CAFA and motion to remand should have been granted).  However, in *Baumann*, the Ninth Circuit specifically declined to address "whether a federal court may allow a PAGA action otherwise within its original jurisdiction to proceed under Rule 23 as a class action."  *Id.* at 1124.

While PAGA requires a trial court to approve a PAGA settlement, district courts have noted there is no governing standard to review PAGA settlements.  *Sanchez v. Frito-Lay, Inc.*, No. 1:14cv797-DAD-BAM, 2019 WL 4828775, at *12 (E.D. Cal. Sept. 30, 2019) (acknowledging "absence of authority governing the standard of review of PAGA settlements").  "'[N]either the California legislature, nor the California Supreme Court, nor the California Courts of Appeal, nor the [LWDA] has provided any definitive answer' as to what the appropriate standard is for approval of a PAGA settlement."  *Jordan v. NCI Grp., Inc.*, No. EDCV 161701 JVS (SPx), 2018 WL 1409590, at *2 (C.D. Cal. Jan. 5, 2018) (quoting *Flores v. Starwood Hotels & Resorts Worldwide, Inc.*, 253 F. Supp. 3d 1074, 1075 (C.D. Cal. 2017)).  Consequently, some district courts have used the guidance provided by the LWDA in *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016).  *See Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019); *Sanchez*, 2019 WL 4828775, at *12. In *O'Connor*, the LWDA commented,

It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*O'Connor*, 201 F. Supp. 3d at 1133 (quoting LWDA Response). Based on LWDA's Response, district courts have applied "a Rule 23-like standard" asking whether the settlement of the PAGA claims is "fundamentally fair, reasonable, and adequate." *Haralson*, 383 F. Supp. 3d at 972.

PAGA provides that "the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation," except for provisions in which a penalty is specifically provided. Cal. Lab. Code § 2699(f)(2). The civil penalty for wage statement violations is $250 for the initial violation and $1,000 for each subsequent violation. Cal. Lab. Code § 226.3. However, a court may "award a lesser amount than the maximum civil penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code § 2699(e)(2).

The Settlement Agreement provides that Counsel will submit the proposed settlement to the LWDA as required by Cal. Lab. Code § 2699(l)(2) in conjunction with their Motion for Preliminary Approval. Settlement Agreement ¶ 102. At the hearing, counsel confirmed that it was submitted. With this procedural requirement presumably satisfied, the Court turns to whether the Settlement Agreement's $45,000 allocation to PAGA penalties is likely to be found fair, reasonable, and adequate.

Plaintiff calculated the maximum PAGA penalties for the PAGA period (June 26, 2018 and September 30, 2020) to be $4,937,500 for the overtime wage, wage statement, and final pay claims, calculated based on the initial violation rates because Defendant

may not be subject to the heightened rates for the subsequent violations.  *See* ECF No. 43-1 at 21 (citing *Vieyara-Flores v. Sika Corp.*, No. EDCV 19-606 JVS (KKx), 2019 WL 2436998, at *5 (C.D. Cal. June 10, 2019)); Geraci Decl. ¶ 51.  Plaintiff discounted the PAGA penalties by 90% to a realistic exposure of $493,750, given the possibility that the underlying claims may not succeed and the Court's authority to reduce penalties.  *Id.* ¶ 52.

Plaintiff argues that the $45,000 allocated to PAGA penalties, 75% of which will be paid to the LWDA and 25% of which will be paid to aggrieved employees who worked during the PAGA period, is a reasonable settlement of the PAGA claims even though it represents less than 10% of Defendant's realistic exposure.  ECF No. 43-1 at 21.  Plaintiff notes that similarly sized settlements have been approved despite far lower allocations to PAGA penalties.  ECF No. 43-1 at 21 (citing *Magadia v. Wal-Mart Assocs., Inc.*, 384 F. Supp. 3d 1058, 1101 (N.D. Cal. 2019) (collecting cases in which settlements providing for $10,000 in PAGA penalties were preliminarily or finally approved despite total settlement amounts of $900,000 and $6.9 million)).  Indeed, "in actions involving wage and hour class claims and PAGA claims that settle, parties often minimize the total amount of the settlement that is paid to PAGA penalties in order to maximize payments to class members."  *Mejia*, 2021 WL 1122390, at *5.  The public policies underlying PAGA are also likely met here, because the settlement more broadly provides a "robust" remedy for possible violations of the California Labor Code by requiring Defendant to pay about a quarter of its maximum potential exposure on the class claims, and over 64% of the realistic potential value of the class and PAGA claims.[12]  Geraci Decl. ¶¶ 53, 54; *see O'Connor*, 201 F. Supp. 3d at 1134 (noting that "if

---

[12] The Court notes that the Maximum Settlement Amount would constitute only about 10% of Defendant's total maximum potential exposure, including Defendant's maximum PAGA penalties (calculated by combining the $3,552,259 maximum value of class claims and $4,937,500 maximum PAGA penalties).  The Ninth Circuit has noted that a 90% discount off the verdict value of the claims is "at the low end of reasonable recovery."  *O'Connor*, 201 F. Supp. 3d. at 1132.  However, the Court's concerns are somewhat alleviated by the fact that courts often exercise their discretion to reduce PAGA

the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled," but finding that settlement for less than 5% of the total verdict value of claims released was not fair and reasonable).

The Court therefore concludes that the proposed settlement's allocation to PAGA penalties is likely fair, reasonable, and adequate.

6.  To-Be-Withdrawn FLSA Claims

The FAC includes claims under the FLSA, but the parties have agreed to dismiss the FLSA claims without prejudice should the settlement be preliminarily approved. Geraci Decl. ¶ 13; Settlement Agreement ¶ 45.  The Settlement Agreement does not release any FLSA claims.  *Id.* ¶¶ 34, 35.  Given that Plaintiff has legitimate reasons for deciding not to pursue settlement of the FLSA claims based on the limited likelihood of success, and no one has attempted to opt-in to the FLSA collective action, the Court does not find that exclusion of the FLSA claims from the settlement jeopardizes the fairness of the agreement.  *See* Geraci Decl. ¶ 19.

Thus, although much of the Settlement Agreement likely satisfies the "fair, reasonable, and adequate" standard set out in Rule 23(e)(2), the *cy pres* provision likely cannot be approved and the Court requests additional explanation to inform its analysis of whether the settlement provides equitable treatment to different members of the class based on the value of their claims.  The Court therefore DENIES the motion for preliminary approval without prejudice.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

---

penalties where, as here, the potential PAGA penalties would exceed statutory damages.  *See Magadia*, 384 F. Supp. 3d at 1100–01 (collecting cases).

### III.   CONCLUSION

For the reasons set forth above, the Court:

1.  Provisionally approves certification of the class for the purposes of settlement;

2.  Provisionally appoints Plaintiff's counsel as Class Counsel for the purposes of settlement and designates Plaintiff as class representative for the purposes of settlement;

3.  DENIES preliminary approval of the settlement without prejudice.  The Court will permit Plaintiff to file a renewed motion for preliminary approval within 30 days of this Order addressing the deficiencies noted above.

**IT IS SO ORDERED.**

Dated: May 6, 2021

Hon. Gonzalo P. Curiel
United States District Judge